Approved: _____
HOWARD MASTER/ROBERT ALLEN/RICHARD COOPER/IAN MCGINLEY
Assistant United States Attorneys

Before:   THE HONORABLE GABRIEL W. GORENSTEIN
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - x

## 16 MAG 7338

UNITED STATES OF AMERICA      :      **SEALED COMPLAINT**

          - v. -              :      Violations of
                                     18 U.S.C. §§ 371, 1343, 1346,
GARY TANNER and               :      1349, 1956
ANDREW DAVENPORT,
                              :      COUNTY OF OFFENSE:
          Defendants.                NEW YORK
                              :

- - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

          RYAN F. REDEL, being duly sworn, deposes and says that he
is a Special Agent with the Federal Bureau of Investigation ("FBI"),
and charges as follows:

### COUNT ONE
(Honest Services Wire Fraud Conspiracy)

          1.    From in or about December 2012 through in or about
September 2015, in the Southern District of New York and elsewhere,
GARY TANNER and ANDREW DAVENPORT, the defendants, and others known
and unknown, willfully and knowingly did combine, conspire,
confederate, and agree together and with each other to commit honest
services wire fraud in violation of Title 18, United States Code,
Sections 1343 and 1346.

          2.    It was a part and an object of the conspiracy that
GARY TANNER and ANDREW DAVENPORT, the defendants, and others known
and unknown, willfully and knowingly, having devised and intending
to devise a scheme and artifice to defraud, and to deprive TANNER's
employer, the multinational pharmaceutical company Valeant

1



Pharmaceuticals International, Inc. ("Valeant") of its intangible right to TANNER's honest services, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346, to wit, DAVENPORT, while serving as the Chief Executive Officer and owner of a Philidor Rx Services LLC ("Philidor"), a specialty mail-order pharmacy company headquartered in Hatboro, Pennsylvania, that worked closely with Valeant, paid TANNER approximately $10 million in kickbacks, with the prospect of additional kickback payments, in exchange for TANNER's efforts as a Valeant executive to advance DAVENPORT's interests, including by facilitating transactions that enabled DAVENPORT to obtain over $40 million, and potentially tens of millions of additional dollars, from Valeant.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
(Honest Services Wire Fraud)

3.    From at least in or about December 2012, up to and including at least in or about September 2015, in the Southern District of New York and elsewhere, GARY TANNER and ANDREW DAVENPORT, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive TANNER's employer of its intangible right to TANNER's honest services, and attempting to do so, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, DAVENPORT, while serving as the Chief Executive Officer and owner of Philidor, paid TANNER approximately $10 million in kickbacks, with the prospect of additional kickback payments, in exchange for TANNER's efforts as a Valeant executive to advance DAVENPORT's interests, including by facilitating transactions that enabled DAVENPORT to obtain over $40 million, and potentially tens of millions of additional dollars, from Valeant.

(Title 18, United States Code, Sections 1343, 1346, 1349 and 2.)

2

## COUNT THREE
(Travel Act Conspiracy)

4.    From in or about December 2012 through in or about September 2015, in the Southern District of New York and elsewhere, GARY TANNER and ANDREW DAVENPORT, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, a violation of Title 18, United States Code, Section 1952.

5.    It was a part and an object of the conspiracy that GARY TANNER and ANDREW DAVENPORT, the defendants, and others known and unknown, willfully and knowingly would and did travel in interstate commerce, and use and cause to be used the mail and facilities in interstate and foreign commerce, with the intent to distribute the proceeds of an unlawful activity, and to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, to wit, the offering by DAVENPORT and acceptance by TANNER of commercial bribes in violation of New York Penal Law Sections 180.00 and 180.05, and thereafter would and did perform and attempt to perform an act to distribute the proceeds of said unlawful activity, and to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of said unlawful activity, in violation of Title 18, United States Code, Sections 1952(a)(1) and (a)(3).

### Overt Act

6.    In furtherance of the conspiracy and to effect the illegal object thereof, the following overt act, among others, was committed in the Southern District of New York and elsewhere:

a.    On or about December 15, 2014, GARY TANNER and ANDREW DAVENPORT, the defendants, caused $31,386,370.40 to be wire transferred from a bank account belonging to Valeant in the Southern District of New York to a bank account in Pennsylvania belonging to End Game LP.

(Title 18, United States Code, Section 371.)

3

## COUNT FOUR
(Money Laundering Conspiracy)

7.     From in or about December 2012 through in or about September 2015, in the Southern District of New York and elsewhere, GARY TANNER and ANDREW DAVENPORT, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other, to violate United States Code, Section 1956(a)(1)(B)(i).

8.     It was a part and object of the conspiracy that GARY TANNER and ANDREW DAVENPORT, the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions, to wit, wire transfers, represented the proceeds of some form of unlawful activity, unlawfully, willfully, and knowingly would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, the proceeds of the honest services fraud and Travel Act schemes charged in Counts One through Three, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), to wit, TANNER and DAVENPORT established shell entities which they used to receive proceeds of the crimes charged in Counts One through Three, including through banks located in the Southern District of New York, and to conceal and disguise the location, the source, the ownership and the control of these proceeds.

(Title 18, United States Code, Section 1956(h).)

The bases for deponent's knowledge and for the foregoing charges are, in part, as follows:

9.     I have been a Special Agent with the FBI for approximately 5 years.  I am currently assigned to the squad responsible for investigating violations of federal securities laws and related offenses.  I have participated in multiple investigations of corporate fraud and money laundering offenses.  I am familiar with the facts and circumstances set forth below from my participation in the investigation of this case, from my personal knowledge, and from my conversations with other law enforcement officers and others.  Because this Affidavit is being submitted for

4

the limited purpose of establishing probable cause, I have not
included every fact I have learned during the investigation.  Where
the actions, statements and conversations of others are recounted
herein, they are related in substance and in part, unless otherwise
indicated.

### RELEVANT ENTITIES AND INDIVIDUALS

10.   From my review of publicly available information,
documents collected during the course of this investigation, and
interviews of witnesses, I have learned, in sum and substance, that:

a.   Valeant Pharmaceuticals International, Inc.
("Valeant") is a pharmaceutical manufacturer headquartered in
Canada, with its principal place of business in New Jersey.  Valeant
generates billions of dollars in revenue from a wide array of
pharmaceutical products, including dermatological products.  Many
of Valeant's branded drugs have less-expensive generic substitutes,
a result of which is that health insurers have frequently refused
to cover Valeant-branded drugs, instead requiring substitution with
generic competitors, or have required prior authorization for the
drugs to be covered.

b.   Philidor Rx Services LLC ("Philidor") is a
specialty mail-order pharmacy that was formed in or about January
2013 with the assistance of Valeant, including the provision of
financing, personnel, and supervision.  Philidor terminated
operations in or about January 2016.  During the course of Philidor's
existence, at least 90 percent of the drugs dispensed by Philidor
were Valeant-branded drugs.

c.   Medicis Pharmaceutical Corporation ("Medicis")
was a pharmaceutical company based in Arizona.  Medicis specialized
in dermatological products.  Medicis was acquired by Valeant in or
about December 2012.

d.   GARY TANNER, the defendant, worked for Medicis
from in or about 2010 until in or about December 2012.  After Valeant
acquired Medicis, TANNER was hired by Valeant as its Executive
Director of Commercial Analytics.  By April 2013, Valeant also
appointed TANNER to be the Senior Director for Valeant's "Access
Solutions Team."  In that position, TANNER had direct access to
senior management of Valeant.

5

e.   ANDREW DAVENPORT, the defendant, created Philidor with the assistance of TANNER, Valeant, and others. DAVENPORT served as Philidor's Chief Executive Officer ("CEO") throughout the period of its existence.

## BACKGROUND AND OVERVIEW

11.   As described herein, there is probable cause to believe that GARY TANNER and ANDREW DAVENPORT, the defendants, engaged in an illegal, concealed kickback scheme that they hoped would yield them tens of millions of dollars in personal profits. TANNER, even though at all relevant times a Valeant executive, secretly worked with DAVENPORT to promote Philidor's business, with the goal of ultimately consummating a purchase option agreement between Valeant and Philidor that resulted in tens of millions of dollars for DAVENPORT personally (as Philidor's principal shareholder) and close to ten million dollars in secret kickback payments to TANNER.

12.   Specifically, while TANNER was employed as an executive of Valeant and DAVENPORT was the CEO of Philidor, TANNER advanced the interests of Philidor and DAVENPORT in a variety of ways, including by: (i) establishing and growing Philidor using Valeant human and financial resources; (ii) resisting efforts by Valeant's senior leadership to enter into business relationships with Philidor's competitors, thereby increasing Valeant's dependence on Philidor; (iii) securing favorable treatment of Philidor by Valeant; (iv) ultimately promoting Valeant's purchase of an option to acquire Philidor in a transaction that proved extremely lucrative for DAVENPORT (and, ultimately, for TANNER); and (v) distributing hundreds of millions of dollars of Valeant's products through Philidor in an effort to increase the likelihood DAVENPORT would obtain tens of millions of dollars in sales-based milestone payments that were part of the terms of the option acquisition.

13.   As described in greater detail below, in exchange for these efforts by GARY TANNER, the defendant, to use his position as an executive with Valeant to promote the interests of Philidor and ANDREW DAVENPORT, the defendant, DAVENPORT agreed to kick back to TANNER a portion of the sums he obtained from Valeant.  For example, in or about December 2014, Valeant purchased an option to acquire Philidor pursuant to an agreement (the "Option Agreement"), and as part of that transaction, DAVENPORT personally obtained over $40 million from Valeant, with the prospect of tens of millions of dollars

more in the future.  In exchange for TANNER's efforts to advance
DAVENPORT's interests while serving as a Valeant executive,
DAVENPORT kicked back approximately $10 million to TANNER.  The
kickback payments were made in secret and were laundered through a
series of shell companies and transactions designed to conceal the
illicit source, nature, ownership, and control of the funds.

14.  GARY TANNER and ANDREW DAVENPORT, the defendants,
continued to conspire to advance DAVENPORT's and Philidor's
interests vis-à-vis Valeant in 2015 in order to obtain tens of
millions of dollars in sales-based milestone payments described in
the Option Agreement.  In email communications between TANNER and
DAVENPORT concerning the scheme, DAVENPORT, evoking images from the
old Western, *Butch Cassidy and the Sundance Kid*, talked about how
they would "ride into the sunset" together, and TANNER stated that
until that point he would have to "keep playing the game," by which
I believe TANNER meant he would keep pretending to act solely in
Valeant's interest, while in fact advancing DAVENPORT's and TANNER's
personal interests.

**TANNER WAS A VALEANT EMPLOYEE WITH A POSITION OF TRUST AND A DUTY
TO REPRESENT VALEANT'S INTERESTS AND AVOID CONFLICTS OF INTEREST**

15.  Based upon my review of publicly available documents,
documents provided by Valeant, and interviews of Valeant employees,
I have learned, in sum and substance:

a.  While working at Medicis, GARY TANNER, the
defendant, was in charge of what was known as Medicis's "alternative
fulfillment" ("AF") program.  Medicis's AF program was developed for
pharmaceuticals that experienced low rates of insurance coverage
because of their cost or the availability of generic substitutes.
The AF program attempted to cause patients to take their
prescriptions for such Medicis drugs to certain specialty pharmacies
that would assist patients and doctors in obtaining insurance
coverage for those drugs or would provide other incentives for
patients to purchase Medicis-branded drugs instead of generic
substitutes.

b.  In or about December 2012, Valeant acquired
Medicis and hired TANNER and a number of others who worked under
TANNER in running Medicis's AF program.  In documents that were later
prepared for Valeant's Board of Directors, Valeant recognized TANNER
as a "key organization talent" that Valeant retained after acquiring

7

Medicis.

           c.    By April 2013, Valeant had appointed TANNER to be the Senior Director for the "Access Solutions Team," which was responsible for Valeant's AF initiatives and patient access programs, among other things.  TANNER later was promoted to the position of Vice President responsible for Access Solutions.

           d.    During TANNER's employment by Valeant, TANNER occupied a managerial position of trust at the company.  In particular, TANNER supervised programs that were responsible for generating hundreds of millions of dollars in sales for Valeant; he reported to and had access to Valeant's top executives, including the company's CEO, on various issues; and he interacted directly with Valeant's customers, suppliers, and auditors as an executive of Valeant.

           e.    Over the course of TANNER's work for Valeant, TANNER proposed and assumed responsibility for supporting and supervising the operation of Philidor, a new mail-order pharmacy that, as described in greater detail below, assumed an increasingly large role in Valeant's AF program and its financial performance. As part of TANNER's work at Valeant on supporting and growing Philidor, TANNER interacted directly with Philidor's executives, including ANDREW DAVENPORT, the defendant.  TANNER also supervised employees who worked partially or wholly out of Philidor's offices in Pennsylvania, including sales and managerial staff employed by Valeant and certain staff employed by Philidor.  Even while TANNER served in this capacity at Philidor, however, TANNER was still considered and treated as a Valeant employee, receiving compensation, performance ratings, and compliance training from Valeant.

           f.    TANNER worked at Valeant until his termination in late August 2015.  After being terminated by Valeant, TANNER was hired by Philidor, although he began negotiating a consulting agreement with Valeant to continue performing work for Valeant even while serving as a Philidor employee.

           g.    A review of TANNER's bank records, obtained pursuant to subpoena, reflects that TANNER received salary payments exclusively from Valeant until September 2015, and that TANNER received no compensation of any kind directly from Philidor until late September 2015.

8

    h. Philidor effectively dissolved in early 2016, after the nature of the relationship between Philidor and Valeant, described below, was discovered.

    i. During TANNER's time as a Valeant employee, Valeant paid TANNER millions of dollars in salary, bonuses, stock options, and restricted stock grants to represent its interests.

    j. At all relevant times, Valeant had in place a company policy·called the "Standards of Business Conduct" (the "Code of Conduct").  The Code of Conduct contained a section on "Conflicts of Interest," which, among other things:

    (i) prohibited "any business, financial or other relationship with any individual or entity, including suppliers, customers or competitors, that might impair or even appear to impair the independence of Valeant";

    (ii) contained a list of specific examples of transactions that were presumptively prohibited, including receipt of gifts of more than a nominal value from a customer or supplier, and "[o]wnership by an employee or any member of the employee's family of a substantial interest in any concern that does business with Valeant, whether as a supplier, dealer or customer";

    (iii) contained a subsection on "Corporate Opportunities," which prohibits an employee from "personally tak[ing] advantage of or benefit[ing] from any business opportunity that may be of interest to Valeant."  As to the meaning of this provision, the Code of Conduct notes: "This means that we may not personally take opportunities that are discovered through the use of corporate property, information or position for personal gain, or compete with the Company.";

    (iv) required Valeant employees to "make full written disclosure" of any outside activities or relationships that might present a conflict of interest and "receive prior written approval" for such activities.

    k. TANNER repeatedly certified that he was aware of Valeant's Code of Conduct, completed training on the Code of Conduct, and stated that he was in full compliance with the Code of Conduct.  TANNER's certifications related to the Code of Conduct

include the following:

(i)   TANNER's December 2012 offer letter to
join Valeant as an employee stated that it was contingent on TANNER's
commitment to compliance with the Code of Conduct.   TANNER signed
this offer letter, affirming his commitment.

(ii) In mid-2013, TANNER signed a certification
that he was aware of Valeant's compliance policies and TANNER'S
responsibility to comply with these policies.   TANNER also certified
that he was "not aware of any conduct involving Valeant employees
that violates any applicable laws, regulations, or Valeant
compliance policies or procedures," and that "if he [had] any
questions" about whether an activity is compliant with laws and
policies, TANNER would "consult with [his] supervisor or the Valeant
Compliance Department before engaging in such activities."

(iii) On October 24, 2014, TANNER certified by
email (hereinafter, the "October 2014 Code of Conduct
Certification") that he had completed training on the Code of
Conduct, which included training focusing on conflicts of interest.
TANNER further certified that he would comply with the Code of
Conduct, that he had "received, read, and underst[ood]" the Code of
Conduct, and that he was aware of his "obligation to report any
suspected violations of the [Code of Conduct]" of which he was aware.
TANNER further certified that: "To the best of my knowledge,
information and belief, neither I nor any member of my family has
any interest or connection, or has within the past year engaged in
any activity, that constitutes a conflict of interest" as described
by the Code of Conduct.   TANNER also represented that: "To the best
of my knowledge, information and belief, I am not now engaged in any
actions and during the past years have not engaged in any actions
that could be considered as violating" the Code of Conduct.

l.   A search of Valeant's personnel file for TANNER
and TANNER's Valeant email account reflects no occasion on which
TANNER made "full written disclosure" of any outside activities or
relationships, nor that TANNER received "prior written approval" for
any such activities.

m.   I have learned from Valeant's Chief Compliance
Officer (the "Chief Compliance Officer") that TANNER requested
approval on one occasion to enter into a financial relationship with
Philidor as a landlord of property that was to be rented by Philidor,

10

reflecting his knowledge that the Code of Conduct required approval for potential conflicts of interest.  That request for approval was denied.  The Chief Compliance Officer further stated that Valeant never received any requests by TANNER for approval to enter into any other financial relationship with Philidor or its principals, including DAVENPORT, or to receive any other financial benefits from Philidor or its principals.  Nor did TANNER disclose his intended or actual receipt of any such benefits.

          n.     During the course of TANNER's work as a Valeant employee, he was asked directly by Valeant representatives whether he had any financial stake in Philidor on more than one occasion, and TANNER denied (falsely, as set forth below) that he had any such financial stake.

## TANNER SUPPORTED PHILIDOR AND PROMOTED IT WITHIN VALEANT

          16.    From my review of documents collected during the course of this investigation, and interviews with current and former Valeant and Philidor employees and investors, I have learned the following, in sum and substance, concerning the creation of Philidor:

          a.     The AF program of Medicis, and later Valeant, sought ways to incentivize doctors and patients to prescribe and fill their branded products as opposed to generic alternatives.  On or about January 11, 2012, Medicis entered into an agreement with an established, commercial health care provider ("Health Care Provider-1"), to support the Medicis AF program by providing assistance to patients in filling prescriptions for specific Medicis pharmaceuticals that required special assistance or that posed challenges for reimbursement from insurance companies.

          b.     After joining Valeant, GARY TANNER, the defendant, used his position at Valeant to support and provide financing for Philidor, even though Health Care Provider-1 was already providing similar services to Valeant.  Among other things, TANNER promoted the proposal to partner with Philidor as a way of supporting Valeant's AF program.

          c.     Reflecting TANNER's responsibility for Philidor, on or about January 3, 2013, TANNER sent an email to senior executives at Valeant in which he requested Valeant's approval for the Philidor project.  The proposal included Valeant's commitment to advance $2 million in funds to Philidor after the fulfillment of

11

certain milestones, and to provide expertise and other support to
the new pharmacy.  In connection with TANNER's request for approval,
TANNER submitted a standard Valeant form called a "Contract Approval
Form" ("CAF") that listed TANNER as the "INITIATOR" of the contract
with Philidor and described him as the "VALEANT EMPLOYEE PRIMARILY
RESPONSIBLE FOR ADMINISTRATION AND PERFORMANCE OF CONTRACT."
Valeant records reflect that the CAF was signed by eight senior
Valeant executives, including the company's CEO.

          17.  According to Philidor's January 15, 2013 Operating
Agreement (the "Philidor Operating Agreement"), ANDREW DAVENPORT,
the defendant, was the company's largest beneficial owner.
Specifically, approximately 6% of the equity in Philidor was held
by a trust managed by DAVENPORT and approximately 30.5% of the equity
in Philidor was held by an entity named End Game LP.[1]  Based on my
review of incorporation documents and bank records for End Game LP,
I have learned that DAVENPORT was the sole signatory on bank accounts
for End Game LP, and that in documents provided to financial
institutions, DAVENPORT and another entity controlled by DAVENPORT
named "End Game LLC" were the sole disclosed owners of End Game LP.

          18.  The Philidor Operating Agreement did not reflect any
equity interest in Philidor held by Valeant or any of its employees,
including GARY TANNER, the defendant.  On or about March 22, 2013,
an employee of Valeant's SEC Reporting unit sent an accounting
memorandum on the appropriate accounting for Valeant's relationship
with Philidor to a number of people, including TANNER.  The
memorandum concluded that the financial results of Philidor would
not be consolidated into Valeant's financial results, based in part
on the representation that Philidor's "equity owners are independent
of Valeant and Medicis."  TANNER approved of this portion of the
accounting memorandum without any edits or comments.

          19.  Throughout the course of 2013, GARY TANNER, the
defendant, while an executive of Valeant, helped grow Philidor's
operations and its business with Valeant.  During this time, while
serving in a position of trust at Valeant, TANNER promoted Philidor
to senior executives at Valeant and otherwise worked to advance the
interests of Philidor and ANDREW DAVENPORT, the defendant.  TANNER's

---

[1] The balance of the equity in Philidor was held by DAVENPORT's
colleagues at a consulting firm that he managed, former business and
personal associates of DAVENPORT who provided start-up capital to
Philidor, and entities associated with those individuals.

efforts in this regard included, but were not limited to, the following:

a.     Even though TANNER was responsible for Valeant's AF program as a whole, which included numerous preexisting relationships with other companies and entities, TANNER dedicated a large percentage of his time and that of his direct subordinates to building Philidor.   TANNER and his staff spent substantial time in Philidor's offices in Pennsylvania, working on the development and growth of Philidor.

b.     By dedicating substantial Valeant resources to the support and development of Philidor, TANNER enabled Philidor to obtain the $2 million in Valeant milestone payments set forth in the proposal that TANNER had submitted to Valeant executives.

c.     TANNER used his position as head of AF to sponsor and promote Philidor, including by listing himself as the "initiator" of all agreements with Philidor, and as the Valeant employee primarily responsible for administration and performance of all Philidor contracts.

20.   ANDREW DAVENPORT, the defendant, recognized TANNER's central role in enabling Philidor's growth and success within Valeant. In an email DAVENPORT sent to TANNER in or about August 2013, DAVENPORT stated of TANNER: "We both know that this endeavor would face a nearly insurmountable uphill struggle to succeed in the present Valeant environment without your confident support and the efforts of your team.   I don't want you to think that fact will escape my mind for even a moment as we continue to build and refine this business."

## VALEANT QUESTIONS TANNER'S ROLE AT PHILIDOR AND TANNER DENIES HOLDING AN EQUITY INTEREST IN PHILIDOR

21. I have learned the following, in substance and in part, from interviews of a former senior Valeant executive ("Valeant Executive-1"), and from my review of documents:

a.     From in or about 2013 until 2015, Valeant Executive-1 oversaw numerous business units within and affiliated with Valeant, including Philidor.   Valeant Executive-1 reported directly to Valeant's former CEO.   During the relevant time period, GARY TANNER, the defendant, reported to Valeant Executive-1, first indirectly and then directly for a period of time.

13

b.      In or about November 2013, Valeant Executive-1 and others visited Philidor's offices in Pennsylvania to learn more about Philidor's business operations.  Valeant Executive-1 noticed that TANNER appeared to have an office inside Philidor, had access to Philidor's entire office facility, and acted as if he had a managerial role at Philidor by, for example, leading Valeant Executive-1 and others on a tour of Philidor's facility.  This caused Valeant Executive-1 concern because TANNER was a Valeant employee, whom Valeant Executive-1 understood was providing advice to Philidor's sales team, but was not himself running the business.

c.      As TANNER and Valeant Executive-1 were leaving Philidor, Valeant Executive-1 expressed concerns to TANNER about TANNER's level of control over Philidor and other issues.  TANNER replied, in substance and in part, that TANNER knew Valeant Executive-1 would have these concerns and, for this reason, TANNER had hoped TANNER could delay Valeant Executive-1's visit to Philidor.

d.      After Valeant Executive-1's visit to Philidor in November 2013, Valeant Executive-1 shared his concerns about TANNER with other senior executives at Valeant.  As a result of Executive-1's concerns, Valeant removed TANNER from Philidor's offices for a period of time.

e.      During the time Valeant Executive-1 supervised TANNER, Valeant Executive-1 harbored suspicions that TANNER held an undisclosed equity interest or financial stake in Philidor.  Valeant Executive-1's suspicions were based in part on TANNER's degree of control over Philidor, TANNER's efforts to advance Philidor's interests within Valeant, and the potential for TANNER to make a large sum of money by getting in on the ground floor of a start-up operation like Philidor, an entity for which TANNER was devoting time and energy while working at Valeant.

f.      Due to these concerns, Valeant Executive-1 asked TANNER if TANNER held any equity interest in Philidor and if TANNER wanted to go work for Philidor instead of remaining a Valeant employee.  TANNER repeatedly denied having any equity interest in Philidor and told Executive-1 that he (TANNER) wanted to remain a Valeant employee.  Further, TANNER never requested approval from Valeant Executive-1 to enter into any financial relationship with Philidor or its principals.

22. Based on my discussions with Valeant's Chief
Compliance Officer, I have learned that the Chief Compliance Officer
also had concerns that TANNER may have a financial interest in
Philidor in view of TANNER's efforts to advance Philidor's interests,
among other reasons.   The Chief Compliance Officer raised these
concerns to other Valeant Executives.

### TANNER RESISTS VALEANT'S EFFORTS TO DIVERSIFY ITS DRUG DISTIBUTION NETWORK

23.   I have learned from interviews of individuals who
occupied senior executive roles at Valeant in 2013 and 2014, and my
review of relevant emails, that, in sum and substance, GARY TANNER,
the defendant, used his position of trust at Valeant not only to
promote Philidor, but to resist efforts by Valeant to diversify its
AF program so that it did not become overly dependent on Philidor.
In particular, at various times during that period, Valeant senior
executives, including Valeant Executive-1 and others, directed
TANNER to pursue business relationships with other specialty
pharmacies that could complement or compete with Philidor.   As
senior Valeant executives told TANNER, diversifying the AF program
decreased the risk to Valeant if any insurer or other payor cut off
Philidor from its network (a risk known as "payor risk").   TANNER
resisted those efforts, and in fact attempted to use his position
at Valeant to obtain competitive information from Philidor's
competitors and secretly provide it to ANDREW DAVENPORT, the
defendant, in order to advance Philidor's interests and avoid
diversifying away from Philidor.   In particular, I have learned,
among other things, that:

a.   On or about October 9, 2013, TANNER advised
Valeant supervisors via email that he was going to contact a
competitor of Philidor's ("Pharmacy-1") pursuant to the directive
to avoid overreliance on Philidor "to try and start building a
relationship."   However, on or about October 11, 2013, TANNER, using
an email account under the alias "Brian Wilson" that was provided
to TANNER by Philidor and not disclosed to or authorized by Valeant
(hereinafter the "Tanner Brian Wilson Account"), sent an email to
ANDREW DAVENPORT, the defendant, in which TANNER wrote, in substance
and in part:   "I have been talking with the [Pharmacy-1] guy and have
a meeting with him and his partner on Tuesday.   After thinking about
this more, figured it may be best for me to go Solo as the manufacturer
so they don't perceive the meeting being a investigatory trip with
a vendor in an attempt to get information.   As such, no need for you

to make the trip." Based on my training and experience, and participation in this investigation, I believe that in this email, TANNER was advising DAVENPORT that when he met with Pharmacy-1, TANNER would represent himself as acting on behalf of Valeant ("go Solo as the manufacturer") in order to conceal from Pharmacy-1 that TANNER was acting on behalf of Philidor, a competitor ("so they don't perceive the meeting being a investigatory trip . . . to get information").

          b.    On January 17, 2014, TANNER received emails from Valeant Executive-1 and another senior Valeant Executive ("Valeant Executive-2") tasking him with diversifying Valeant's AF program. Valeant Executive-1's email requested that TANNER attempt to enter into business arrangements with Pharmacy-1, as well as two other specialty pharmacies.  TANNER wrote in an email that day that he purportedly was aware of the need to diversify and was in the process of scheduling meetings and "pushing forward with these alternative arrangements."

          c.    On or about January 24, 2014, another senior Valeant Executive ("Valeant Executive-3") sent an email to TANNER, copying Valeant Executive-1, which requested that TANNER support the effort to "complement Philidor" with additional pharmacies, and which stated that Valeant "really need[ed] your input and judgment on [additional pharmacies] in terms of laying out, proposing and hopefully agreeing on a business arrangement."

          d.    Despite TANNER's representations to Valeant senior executives that he was committed to diversifying AF beyond Philidor, and entering into agreements with competitors of Philidor to mitigate payor risk, TANNER never entered into any such agreements, instead informing supervisors, including Valeant Executive-1, at various times that he was too busy building Philidor to enter into arrangements with other pharmacies, or that alternative arrangements would compare unfavorably to Philidor.  As a result of TANNER's failure and/or refusal to diversify the AF program, Valeant did not mitigate payor risk as directed by Valeant's senior executives, and it became increasingly dependent on Philidor to achieve its sales and growth targets.

### TANNER PROMOTES PHILIDOR WITHIN VALEANT

          24.   GARY TANNER, the defendant, provided updates to Valeant's senior management regarding the financial results of Philidor in which he praised Philidor's performance and touted its

future prospects.  For example:

a.  On September 5, 2014, TANNER sent an email to Valeant's CEO, Chief Financial Officer ("CFO"), and other senior executives in which TANNER touted Philidor's performance and stated, "Given the performance through the first half to the year and specifically the significant uptake of the program yielding results far greater than expectation, I temporarily ceased publishing this summary knowing the performance was exceeding expectation."

b.  On September 17, 2014, TANNER met with Valeant's CEO and emailed the CEO a 20-page presentation which described Philidor's growth over time and touted its future prospects.

25.  TANNER's support for Philidor's growth was so extensive and effective that by the time Valeant acquired an option to purchase Philidor in December 2014, as described more fully below, internal Valeant and Philidor documents reflect that Philidor had approximately 450 employees and tens of millions of dollars in revenue, almost all of which was derived from the sale of Valeant products.

**TANNER PROMOTES ACQUISITION OF PHILIDOR BY VALEANT WHILE ARRANGING TO RECEIVE A SECRET KICKBACK FROM THE PROCEEDS OF THE ACQUISITION**

26.  As set forth below, based on my training, experience, and participation in the investigation, I believe that GARY TANNER and ANDREW DAVENPORT, the defendants, conspired to receive and pay kickbacks related to the Option Agreement to purchase Philidor, an entity that Valeant had been instrumental in supporting just a year earlier, and that was almost entirely dependent on Valeant for business.  In particular, TANNER and DAVENPORT began working on creating shell companies and bank accounts to receive and launder kickback payments in the summer of 2014.  In connection with these efforts, TANNER promoted Philidor to Valeant's leadership, raised concerns that Philidor would start to conduct business with Valeant's competitors, and resisted efforts to reduce Valeant's dependency on Philidor.  These efforts helped persuade Valeant to engage in a transaction that cost it and its shareholders close to $300 million, and subjected the company to magnified payor risk.  That transaction resulted in payment of over $40 million to DAVENPORT, with the prospect of further payouts in the future.  Valeant relied on TANNER to advise its leadership and represent its interests over the course of the negotiations to acquire an option to purchase Philidor, but TANNER was simultaneously providing advice and information to

17

DAVENPORT in support of DAVENPORT's efforts to increase the amount that Valeant, TANNER's employer, paid for Philidor. Without Valeant's knowledge or approval, TANNER ultimately received close to $10 million in kickbacks from DAVENPORT out of Valeant's option agreement payout, which were laundered through a series of shell company bank accounts.

27.   Based on my review of Valeant and Philidor emails and relevant financial records, I have learned the following, in sum and substance:

a.   On or about August 1, 2014, TANNER sent an email to Valeant Executive-3 asserting that one of Valeant's competitors wanted to do business with Philidor. In communications during the fall of 2014 with Valeant's CEO, Valeant Executive-3, and others, TANNER stated that Philidor was planning to begin doing business with Valeant's competitors, absent acquisition of Philidor by Valeant. Based on my review of Philidor documents and interviews of Valeant and Philidor employees, I have found no evidence that any such interest was expressed by Valeant's competitors, nor that Philidor had developed any specific business plans to do business with Valeant's competitors.

b.   On or about August 27, 2014, ANDREW DAVENPORT, the defendant, sent an email to GARY TANNER, the defendant, using the secret Tanner Brian Wilson Account, asking TANNER, "Can you shoot me the info on that Delaware entity we talked about?" TANNER responded the same day, stating, "I haven't set it up yet – the name will be Befrielse Consolidated, LLC.... Once established, I can get you EID [sic] and anything else needed from your end."

c.   On or about September 5, 2014, approximately one week after TANNER and DAVENPORT discussed the formation of Befrielse Consolidated, LLC (hereinafter, "Befrielse"), TANNER sent the email described above in paragraph 23 to Valeant's CEO and others asserting that he had held off communicating about Philidor because its performance was "far greater than expectation" but that he was doing so now to share positive information with Valeant leadership.

d.   Records of a Delaware registered agent (the "Registered Agent") reflect that on or about September 15, 2014, approximately 10 days after TANNER touted Philidor's performance to Valeant's senior leadership, TANNER arranged for the Registered Agent to form Befrielse and register it with the Delaware Secretary

of State.  Publicly-filed registration documents filed by the
Registered Agent list only the Registered Agent and its employee as
contacts for Befrielse, and do not reveal any connection between
TANNER or DAVENPORT and Befrielse.

              e.    Two days after the Registered Agent formed
Befrielse and registered it at TANNER's direction, on September 17,
2014, TANNER had the conversation and email communication with
Valeant's CEO set forth above in paragraph 23 which he touted
Philidor's performance and future prospects.

              f.    On or about October 14, 2014, TANNER and
DAVENPORT exchanged additional emails using the Tanner Brian Wilson
Account concerning the establishment of Befrielse.  Two days later,
on or about October 16, 2014, TANNER arranged for a meeting attended
only by Valeant's CEO and CFO, TANNER (purporting to represent
Valeant), and DAVENPORT, during which they discussed a potential
acquisition of Philidor by Valeant.

              g.    According to public disclosures made by Valeant
concerning Philidor in 2015, Valeant ultimately decided it needed
to acquire Philidor at least in part because it was concerned that
Philidor would begin doing business with Valeant's competitors,
thereby reducing Valeant's ability to use Philidor to achieve its
objectives.  For reasons set forth above, I believe that TANNER was
a critical source for these concerns, and further that these concerns
were based in part on Valeant's dependence on Philidor resulting from
TANNER's refusal to diversify Valeant's AF business.

              h.    During Valeant's negotiations with Philidor
regarding the Option Agreement, while TANNER was purportedly
representing Valeant's interests, he was at the same time providing
advice and counsel to DAVENPORT regarding the negotiations.  For
example, on or about October 27, 2014, three days after TANNER
completed the October 2014 Code of Conduct Certification in which
he denied having any conflict of interest, DAVENPORT wrote to TANNER,
using the Tanner Brian Wilson Account, to ask for advice on how he
might obtain financial terms that were more favorable to DAVENPORT
and Philidor vis-à-vis Valeant.

              i.    At the same time TANNER was advising DAVENPORT
on how to obtain more favorable terms from Valeant, TANNER exchanged
emails (using TANNER's authorized Valeant email account) with
Valeant executives concerning the Option Agreement.  In these

19

emails, TANNER, as Valeant's subject matter expert on Philidor, was asked by a Valeant executive tasked with negotiating the terms of the Option Agreement ("Valeant Executive-4") what sort of due diligence was required for the acquisition. TANNER advised Valeant that very little due diligence was required before the purchase.   I have learned from Valeant Executive-4 that Valeant Executive-4 relied in part on TANNER's advice concerning the amount of due diligence to conduct.

                j.   In addition, Valeant Executive-4 forwarded to TANNER an email in which DAVENPORT had included a financial analysis (which I believe was in fact prepared with TANNER's assistance) that characterized the net revenue earned by Valeant on products sold through Philidor.   Valeant Executive-4 asked TANNER about DAVENPORT's analysis because Valeant Executive-4 believed it was overly favorable to Philidor and DAVENPORT.   TANNER responded that DAVENPORT's analysis "doesn't seem too far off" and thus could be used as a basis for valuing the Option Agreement.

                k.   Throughout the negotiation of the Option Agreement, TANNER had direct contact with the most senior decision makers at Valeant.   Among other things, TANNER, along with DAVENPORT, attended a November 2014 meeting of the Valeant Board of Directors supporting the Option Agreement, during which TANNER led a tour of Philidor for the Board of Directors.

                l.   Senior executives at Valeant planned to rely on TANNER, among others, to advance Valeant's interests at Philidor after execution of the Option Agreement.   For example, Valeant Executive-4 sent an email to the Valeant CEO on November 26, 2014 regarding the status of negotiations, in which Valeant Executive-4 wrote, "[U]ltimately we have to trust the management team and the people that we have providing oversight (i.e. Gary [TANNER], Compliance person, etc) to do their jobs and make sure this [i.e., Philidor] is running correctly."

        28.   From my interview with one of Philidor's beneficial owners ("Beneficial Owner-1"), I have learned, in sum and substance, that:

                a.   Beneficial Owner-1 invested in Philidor and, in return, received a 1.35% equity stake in Philidor.

                b.   In or around October 2014, ANDREW DAVENPORT, the

defendant, told Beneficial Owner-1, in sum and substance, that he planned to give GARY TANNER, the defendant, a portion of DAVENPORT's payout from Valeant's acquisition of Philidor for TANNER's work on behalf of Philidor.

### TANNER RECEIVED APPROXIMATELY $10 MILLION IN CONCEALED KICKBACKS FROM DAVENPORT OUT OF VALEANT'S PAYMENT FOR THE OPTION TO ACQUIRE PHILIDOR

29.    Ultimately, Valeant and Philidor entered into the Option Agreement on or about December 15, 2014.   The Option Agreement was signed at a law firm in Manhattan.   Among the terms of the Option Agreement:

a.    Valeant had the right to acquire Philidor for no additional consideration, and to future Philidor profits;

b.    Valeant was to make an immediate $100 million payment to Philidor's beneficial owners, with several additional milestone payments, including a time-based milestone payment of $33 million on January 15, 2015, and several $25 million sales-based milestone payments that could be achieved if certain sales targets were met, regardless of the profitability to Valeant of those sales. The Option Agreement also forgave pre-existing obligations of Philidor, including a large line of credit that Philidor had accrued with Valeant as a result of certain large orders that Philidor had placed with Valeant with the participation of Valeant's senior executives at the end of the third quarter of 2014 and immediately prior to execution of the Option Agreement;[2] and

c.    The Option Agreement required DAVENPORT to certify that neither Philidor nor its agents or employees had paid or agreed to pay "any contribution, gift, bribe, rebate, payoff, influence payment, kickback or other payment or transfer of value" to any person for any prohibited purpose, including "(A) to obtain favorable treatment in securing business, (B) to pay for favorable treatment for business secured, or (C) to obtain special concessions or pay for special concessions already obtained for or in respect of" Philidor.   As set forth in this Complaint, DAVENPORT's certification was false.

---

[2] In all, Valeant's auditors concluded that the cost to Valeant of the Philidor acquisition approached $300 million.

21

30.   When the Option Agreement was signed, $100 million in total was sent by wire transfer from a Valeant bank account located in the Southern District of New York to bank accounts of the beneficial owners of Philidor.   The $100 million was distributed according to the beneficial owners' disclosed percentage ownership of Philidor.   ANDREW DAVENPORT, the defendant, provided to Valeant the wire instructions for the distribution of the $100 million payment.   In January 2015, when Philidor reached the first time-based milestone set forth in the Option Agreement, Valeant wired an additional $33 million to the beneficial owners of Philidor.   In total, ANDREW DAVENPORT, the defendant, personally received over $40 million of these sums from Valeant into bank accounts he controlled.

31.   Based on my review of records provided by financial institutions, I have learned the following, among other things, regarding the flow of Option Agreement payments from Valeant to entities controlled by GARY TANNER and ANDREW DAVENPORT, the defendants:

a.   On or about December 15, 2014, the day that the Option Agreement was executed, Valeant wired $31,386,370.40 from a bank account in Manhattan to a UBS account in Pennsylvania in the name of End Game LP (the "End Game LP Account").   The End Game LP Account did not have any other funds at the time of this transfer, and in fact was only opened on that date.   The next day, on or about December 16, 2014, the entire $31,386,370.40 in the End Game LP Account was transferred by DAVENPORT to another UBS account in the name of an entity called End Game LLC (the "End Game LLC Account"). Both the End Game LP Account and End Game LLC Account listed DAVENPORT as the sole signatory of the accounts, and DAVENPORT's home address as the addresses of the entities.

b.   On or about December 16, 2014, the same day that the $31,386,370.40 in Valeant funds was transferred into the End Game LLC Account, DAVENPORT transferred approximately $7,472,745.33 from the End Game LLC Account through Manhattan to a bank account in the name of Befrielse (the "Befrielse Account"). Bank records list TANNER as the sole signatory on the Befrielse Account, and TANNER's home address as the address of the entity.

c.   On or about January 15, 2015, Valeant wired an additional $12,734,715.00 from a bank account in Manhattan to the End Game LP Account as End Game LP's share of the time-based milestone

payment due under the Option Agreement.   On or about January 26, 2015, DAVENPORT transferred this entire sum from the End Game LP Account to the End Game LLC Account, as he had done with the initial $31,386,370.40.   On that same day, DAVENPORT transferred approximately $2,231,250 from the End Game LLC Account through Manhattan to the Befrielse Account controlled by TANNER.

        d.    TANNER subsequently used the funds he received from DAVENPORT, and, derivatively, Valeant, to pay for personal expenses, retire debts, and make investments, among other things. For example:

        (i)    On or about December 18, 2014 and December 29, 2014, TANNER transferred approximately $2,000,000, and $4,500,000, respectively, from the Befrielse Account to a Bank of America checking account held in his own name (the "Tanner BOA Account").

        (ii) On or about December 22, 2014, TANNER transferred approximately $2,000,000 from the Tanner BOA Account to fund TANNER's retirement account.   Similarly, on or about December 29, 2014, TANNER made a payment of approximately $22,583 towards student loans and a payment of approximately $3,705.92 towards a credit card.   On or about December 31, 2015, TANNER transferred approximately $175,000 into a personal brokerage account.   And on or about April 15, 2015, TANNER purchased an additional home for approximately $750,000.   Based on my review of emails, this transfer appears to have been used to purchase a property.

        e.    DAVENPORT used his share of the proceeds to satisfy outstanding financial obligations, purchase tens of millions of dollars in securities, and purchase luxury goods.   Among other things, DAVENPORT withdrew $500,000 in cash; purchased over $20 million in securities managed by UBS; spent over $200,000 on a mortgage on an existing home and the purchase of what I believe is an additional home; and paid approximately $50,000 towards the installation of a custom wine cellar.

        32.    Based on my review of documents and conversations with representatives of Valeant, I have learned, among other things, that the above-referenced payments by ANDREW DAVENPORT, the defendant, to GARY TANNER, the defendant, were never disclosed by TANNER (or anyone else) to Valeant or approved by Valeant, and that to the contrary, the financial relationship was actively concealed

from Valeant.  For example:

    a.    The Option Agreement required the disclosure of all individuals and entities with an equity interest in Philidor and all individuals receiving bonus payments in connection with execution of the Option Agreement, which were listed in schedules to the Option Agreement.  Neither those schedules, nor any other document executed in connection with the Option Agreement, however, listed either TANNER or Befrielse as having an equity, or other, interest in Philidor.

    b.    TANNER did not make any disclosure to Valeant or representatives of Valeant of any purported interest in Philidor, directly or indirectly, or any financial relationship with or receipt of benefits from DAVENPORT or affiliated entities, at any time.  To the contrary, as set forth above, TANNER falsely denied having any such financial interests in emailed conflict of interest certifications and when asked directly by senior Valeant executives.

    33.    Based on my training, experience, and participation in the investigation of this matter, I believe that the above-described payments from ANDREW DAVENPORT, the defendant, to GARY TANNER, the defendant, were kickbacks that were laundered through the financial transactions described above.  These transactions, at least in part, were designed to conceal critical aspects of the kickback scheme described above.  This conclusion is based on TANNER's and DAVENPORT's concealment of the payments, described above, as well as the following:

    a.    Documents received in response to subpoenas to End Game LP, End Game LLC, and Befrielse (collectively, the "Shell Companies") reflect that there are no investment agreements, contracts, or other documentation of any kind giving TANNER or Befrielse any bona fide equity interest in End Game LP or End Game LLC, or any contractual or other right to a share of the proceeds of the Option Agreement.

    b.    DAVENPORT did not disclose any bona fide financial interest that TANNER had in Philidor, directly or indirectly through End Game LP or End Game LLC.  As set forth above, neither TANNER nor Befrielse were listed as beneficial owners of Philidor or as recipients of bonus payments in schedules attached to the Option Agreement.  In other documents submitted to governmental authorities and financial institutions by DAVENPORT,

DAVENPORT also did not make any disclosures about TANNER's financial interest.   Among other things, DAVENPORT informed a State Board of Pharmacy that he owned 99.9% of End Game LP, and that End Game LLC owned the remaining 0.1%.   DAVENPORT further stated that he was 100% owner of End Game LLC.   Other documents submitted by DAVENPORT concerning End Game LP and End Game LLC to financial institutions also did not disclose any purported bona fide ownership interest that TANNER had in either entity, either directly or indirectly.

c.   TANNER filed a federal tax return in which he claimed the sum received by Befrielse in 2014 as a long-term capital gain, subject to a lower tax rate than ordinary income, but TANNER refused to provide his accountant with documentation supporting the basis of the purported capital gain or the source of the funds received by Befrielse, citing purported confidentiality agreements governing the receipt of those funds.

d.   In total, approximately $9,703,995.33 was transferred by DAVENPORT to the Befrielse Account, which was controlled by TANNER, between in or about December 2014 and January 2015, all of which moved through the End Game LP Account and the End Game LLC Account in quick succession before reaching the Befrielse Account.   These sums represented the only source of funds received by the Befrielse Account.   Moreover, the sums received from Valeant represented the only source of funds for End Game LP and End Game LLC.   Bank accounts for End Game LP, End Game LLC, and Befrielse (collectively, the "Shell Company Accounts") reflect no economic activity, including purchases or sales of goods or services consistent with operation of a legitimate business, through those entities.

### TANNER SECRETLY CONTINUES TO ADVANCE DAVENPORT'S INTERESTS WHILE A VALEANT EMPLOYEE IN 2015

34.   In the period after execution of the Option Agreement, while GARY TANNER, the defendant, continued to serve in an executive position of trust at Valeant, and was relied on by Valeant's leadership to represent its interests at Philidor, TANNER used that position to advance the interests of Philidor and ANDREW DAVENPORT, the defendant.   For example:

a.   TANNER sought to expand the number of Valeant pharmaceuticals that were sold through Philidor.   TANNER also hired numerous salespeople, at Valeant's expense, that promoted sale of

25

Valeant products through Philidor. This had the effect of increasing Philidor's sales volume and, thus, the likelihood that DAVENPORT would achieve sales-based milestones and accompanying large payouts under the terms of the Option Agreement. TANNER did so even though a subsequent analysis of Valeant's AF performance by an experienced management consulting firm revealed that increases in sales volume through AF channels, in particular Philidor, had in fact adversely affected Valeant's profitability by increasing sales on which there was little prospect of reimbursement by health insurers or that were otherwise unprofitable.

b.      TANNER resisted Valeant's efforts to collect cash from Philidor that Valeant was entitled to collect under the Option Agreement. For example, on July 30, 2015, a Valeant employee sent an email to TANNER requesting that TANNER send Valeant approximately $50 million from Philidor that was due to Valeant under the Option Agreement to meet Valeant's cash needs. TANNER responded that Philidor "may need to hold more for the next two weeks" to meet its own purported needs for cash. In connection with this request for cash, TANNER and DAVENPORT engaged in the following communications with each other:

(i)     Shortly after TANNER resisted Valeant's efforts to collect Philidor's cash, TANNER, using his Valeant email account, informed Philidor employees including DAVENPORT that he had successfully enabled Philidor to wait until the next week to wire funds to Valeant.

(ii) DAVENPORT then forwarded TANNER's email to TANNER at the Tanner Brian Wilson Account, stating: "They are too deep in our shit. Can picture our butch and sundance ride into the sunset (or off the cliff as in the flick) as our wiggle room/ability to operate independently gets whittled down to nothing."

(iii) The next day, July 31, 2015, TANNER replied to DAVENPORT using the Tanner Brian Wilson Account, stating: "Somehow missed this email as I was slammed yesterday......but gave me a good chuckle when I just saw it. Will have to keep playing the game :)."

c.      In August and September 2015, TANNER supported DAVENPORT's efforts to obtain a $25 million sales-based milestone payment from VALEANT, 80 percent ($20 million) of which would have been paid to DAVENPORT via End Game LP under the terms of the Option

26

Agreement. Philidor was able to achieve the sales-based milestone in part as a result of TANNER's efforts to push increasing sales volumes through Philidor using the Valeant-paid Philidor sales team and increase the number of Valeant products filled though the Philidor AF channel. I believe, based on my review of communications concerning this sales-based milestone and TANNER's previous receipt of monies paid to Philidor by Valeant, that TANNER expected to receive a portion of the sales-based milestone payment as a kickback, as he had from the initial option payment and the time-based milestone-payment. These communications include:

(i)   On or about August 5, 2015, as DAVENPORT was attempting to obtain the sales-based milestone payment from Valeant, TANNER sent Philidor purported sales figures to DAVENPORT, supporting DAVENPORT's claim to the payment, using the Tanner Brian Wilson Account. DAVENPORT replied, "Thanks man, that will get us over the hu[m]p quite nicely."

(ii) On or about August 15, 2015, DAVENPORT sent an email to Valeant's CEO stating that the sales figures necessary to trigger the milestone payment were about to be achieved and seeking approval for the payment. In support of that request, DAVENPORT attached a letter asserting that Philidor's expected achievement of the sales-based milestone had been "confirmed . . . with Gary Tanner." Valeant's CEO replied: "Congrats !!" and offered to speak with DAVENPORT about the payment. DAVENPORT then forwarded the email exchange to TANNER at the Tanner Brian Wilson Account, and stated, among other things: "Lets get the wires loaded up and ready to launch!!!"

(iii) On or about September 3, 2015, when the sales-based milestone payment had not yet been issued, DAVENPORT sent an email to TANNER at the Tanner Brian Wilson Account with the subject line "$$$." The email stated: "Still nothing. Don't want to annoy [the Valeant CEO], but he has not responded in any way. Thoughts?" Based on my training, experience, and participation in the investigation of this matter, I believe that in this email, DAVENPORT was asking for TANNER's advice on securing the Valeant CEO's final approval to issue the $25 million sales-based milestone payment. Ultimately, the sales-based milestone payment was not made by Valeant.

35.   From my participation in this investigation, I have learned that neither the nature of Valeant's relationship to

27

Philidor, nor Valeant's increasing dependence on Philidor to achieve
its sales and profitability goals, was disclosed to the public by
Valeant until investor websites and news organizations revealed
suspect aspects of Philidor's operations and Valeant's connection
to Philidor in or about October 2015.   Following and in connection
with these revelations, several insurers and other payors terminated
their contracts with Philidor, resulting in realization of the payor
risk that senior executives at Valeant had sought to avoid by
diversifying away from Philidor, and Valeant's stock price declined
dramatically.

          WHEREFORE, deponent respectfully requests that warrants
be issued for the arrest of GARY TANNER and ANDREW DAVENPORT, the
defendants, and that they be arrested and imprisoned or bailed, as
the case may be.

                                   RYAN F. REDEL
                                   Special Agent
                                   Federal Bureau of Investigation

Sworn to before me this
16th day of November, 2016

THE HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK